IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 19, 2005

## JOHNNY TYUS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Tipton County**
**No. 4513      Joseph H. Walker, III, Judge**

---

**No. W2004-02028-CCA-R3-PC  - Filed May 31, 2005**

---

The petitioner appeals the denial of his petition for post-conviction relief from his conviction for delivery of .5 grams or more of a Schedule II controlled substance, cocaine, arguing that the post-conviction court erred in finding he received effective assistance of trial counsel. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

J. Barney Witherington, IV, Covington, Tennessee, for the appellant, Johnny Tyus.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On March 12, 2003, the petitioner, Johnny Tyus, was convicted by a Tipton County jury of delivery of .5 grams or more of a Schedule II controlled substance, cocaine, a Class B felony, and was sentenced as a Range II, multiple offender to fifteen years in the Tennessee Department of Correction. On March 27, 2003, the same day as the sentencing hearing, the petitioner signed a waiver of appeal. Thereafter, the petitioner filed a *pro se* petition for post-conviction relief on March 8, 2004, alleging multiple claims of ineffective assistance of counsel. Post-conviction counsel was appointed, and an amended petition was filed on April 14, 2004. Among other things, the petitioner asserted in his original and amended petitions that trial counsel failed to file all necessary pretrial motions, failed to challenge the lawfulness of the petitioner's arrest, failed to defend against the affidavit of complaint containing an incorrect name, improperly excluded the petitioner from the

selection of jury members, failed to conduct an independent investigation, failed to interview defense witnesses, failed to communicate properly with the petitioner, failed to call character witnesses at trial, and "did not adopt any trial strategy whatsoever." On appeal, the petitioner presents the claims that trial counsel was ineffective in failing to adopt any trial strategy and in not pursuing the defense of mistaken identity.

The petitioner testified at the evidentiary hearing held on July 16, 2004, that he met with trial counsel for the first time on March 11, 2003, one day before trial, and that the meeting lasted around twenty minutes. Prior to that meeting, the petitioner "didn't even know who [his] attorney was." The petitioner suggested a trial strategy to trial counsel consisting of a challenge to an audiotape of the drug transaction as well as a challenge to what was, according to the petitioner, the affidavit of complaint, which listed the petitioner's name as "Frank Tyus." The petitioner alleged that trial counsel brought the document to court with him the next day and had "whited out" the name "Frank" and inserted "Johnny," the petitioner's first name, as well as the correct social security number, driver's license number, and birth date, although the petitioner testified that the "corrected" birth date was still incorrect. Before trial, trial counsel told the petitioner that the paper "ain't nothing" and that he should accept the plea agreement of six to ten years, rather than go to trial and risk a sentence of twenty to thirty years. The petitioner alleged that trial counsel "was threatening [him] with time, trying to get [him] to cop a plea." The petitioner stated he had never used the alias "Frank" and could not "recall" whether anyone in his family was named "Frank." The petitioner gave trial counsel the names of two potential defense witnesses, his brother-in-law, Randy Murphy, and his sister, Cassandra Tyus, as well as the names of "a couple of more peoples [sic] that knew . . . something about the informant," although the petitioner could not remember any of the names of those other persons at the hearing. Trial counsel "didn't discuss no strategy" with the petitioner, nor did anyone else from the public defender's office. The petitioner also complained that his arrest in Brownsville was "unlawful" because the police did not have an arrest warrant for the charges in Tipton County.

On cross-examination, when asked if he was aware that there was no arrest warrant and that instead a capias was issued for his arrest subsequent to grand jury proceedings, the petitioner stated that the officers who arrested him never showed him a capias. The petitioner stated again that trial counsel changed the name on the affidavit from "Frank" to "Johnny," although admitting that he did not see trial counsel change the name. The petitioner also stated, "If he didn't change it, he brought it to you [the prosecutor] and told you about it, and you changed it." The petitioner also admitted he spent "more than two" nights at the Surreywood Apartments, which was the home of codefendant Canga Buford,[1] whom the petitioner acknowledged was his girlfriend. Asked if he remembered Buford's testimony at trial, that although she denied knowing a drug deal was taking place, she did testify "about the car she owned, that [the petitioner was] her boyfriend, and where [the petitioner] had lived there at Surreywood Apartments," the petitioner responded, "Yeah." The State also introduced as an exhibit an affidavit of complaint from a 2002 driving on revoked license arrest, in

---

[1]The codefendant's name is spelled "Canga" in the indictment; however, her name is spelled "Kanga" throughout the post-conviction transcript.

which the arresting officer swore that the petitioner provided a false name, "Derrick," when he was arrested. The petitioner, although he acknowledged pleading guilty to the charge, stated, "I didn't never [sic] tell no [sic] officer my name was Derrick." After counsel was initially appointed in this matter, and while the petitioner was still in jail, he did not attempt to contact the public defender's office, explaining: "If the judge appointed him to me, that is not my job. That's not my obligation. He supposed [sic] to get in touch with me." Asked why he did not make an effort to contact his attorney between November 2002 and March 2003, the petitioner replied, "Because his ass getting paid for it. . . . He supposed [sic] to do his job." Other than Cassandra Tyus and Randy Murphy, the petitioner refused to give names of any of the witnesses he supplied to trial counsel, stating, "I don't feel like I got to answer that question. Because I might have to use these peoples [sic] again" if he received a new trial. He also stated he would not provide the names of these other witnesses because of the "little crooked tricks y'all be pulling, Man, whiting people's names out and putting other people's names there."

On redirect, the petitioner stated that trial counsel advised him not to testify. When asked if he wanted to testify at trial, the petitioner stated, "I didn't want to testify. Because after they done pulled their little Frank changing around, I didn't want to testify." The petitioner acknowledged that he did not provide the names of any witnesses, other than Cassandra Tyus and Randy Murphy, to post-conviction counsel.

Randy Murphy, the petitioner's brother-in-law, testified concerning the petitioner's arrest in Brownsville. Murphy approached the officers and told them they were in his yard, and the officers told him to "mind [his] own business." Murphy testified that he never saw an arrest warrant or the officers show the petitioner an arrest warrant. He stated he "guess[ed]" the petitioner asked them to see a warrant and the petitioner "probably" asked to see a warrant.

Cassandra Tyus Murphy, the petitioner's sister, testified that the petitioner told her that trial counsel had shown him "a paper with somebody else's name on it," and she told the petitioner he should "check into that." The petitioner did not tell her whether he told trial counsel that the wrong person was arrested, but the petitioner did tell her that trial counsel "acted like he didn't -- he wasn't concerned with him, like he just didn't care, like they wanted to lock him up and throw away the key or something like that."

Trial counsel, who had been employed by the public defender's office for sixteen to eighteen years, testified that he met with the petitioner "at least twice, and may have talked to him on the phone" and that he probably spent "ten hours or less" communicating with the petitioner. He stated that he did not "spend a tremendous amount of time with regard to some of the issues he's raised, based on conversations we had about the reality of the situation." Trial counsel stated that the petitioner initially indicated he was going to plead guilty, so he did not spend a lot of time trying to develop an alibi defense. His investigator also "must have met" with the petitioner because trial counsel noted in his file that he needed information "from scratch," as the petitioner's case went "straight to the Grand Jury." However, trial counsel did not have a record of when the investigator actually met with the petitioner. Trial counsel met with the codefendant and said there was "no

dispute" that it was the defendant in the car with his girlfriend at the time of the undercover transaction. The petitioner did advise trial counsel that he "didn't think" it was his voice on the audiotape, but trial counsel advised him that the State would present the tape to the jury at trial. Trial counsel noted in his file that the petitioner did not provide any alibi witnesses and planned on relying on the fact that the codefendant was his girlfriend and she would not testify against him at trial. The petitioner never told trial counsel, "It wasn't me, and here's my witness. Here's where I was." As to trial strategy, trial counsel testified that he received a letter from the petitioner in February 2004 indicating that he wished to ask the court about going into a rehabilitation program, and counsel inferred from the letter that he should pursue a defense strategy of attempting to reduce the charge to a "misdemeanor casual exchange" charge, as "they were going to be able to prove it was him, since, in fact, it was." As to the name "Frank," trial counsel testified that the confidential informant initially thought that was the petitioner's name, although the officers later learned the petitioner's true name. He testified that the name had already been "whited out" on the document when he first saw it, that he did not alter the document, and that the document was not an affidavit of complaint but a "rough draft" used by the officers. He stated his investigation revealed that there was a "Frank Tyus," but he was in jail in Brownsville at the time of the drug transaction and could not have been the person who sold drugs to the confidential informant. The petitioner never gave trial counsel "the name of somebody that could say where he was on that day." Trial counsel also identified the "Official Forensic Chemistry Report," submitted by the State, which indicated the codefendants were "Buford, Canga" and "Ties, J.T." and which showed a positive test result for 1.4 grams of cocaine.

On July 16, 2004, the post-conviction court entered an order denying the petition, finding, among other things, that the petitioner failed to show by clear and convincing evidence that "the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. The petitioner has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."

## ANALYSIS

### I. Post-Conviction Standard of Review

The petitioner argues the post-conviction court erred in finding that he received the effective assistance of counsel. The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of

correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

## II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner contends on appeal that trial "[c]ounsel was ineffective because he deprived [the petitioner] of the substantial defense of identity due to his negligence in investigating the case." More specifically, the petitioner contends that trial counsel should have developed a defense of misidentification based on the use of an incorrect name in one of the State's documents.

At the evidentiary hearing, the petitioner testified that the altered document was an affidavit of complaint; however, the document appears to be an internal document of law enforcement officers, and trial counsel testified that it was a "rough draft" used by the investigating officers. Moreover, the indictment lists the petitioner's correct name. The petitioner contended at one point that trial counsel altered the document, but when pressed, contended that the prosecutor may have altered the document. Trial counsel testified concerning the questioned document and why he did not develop a strategy based on misidentification:

> When I picked this up, I had the same question. I said, "Well, here it says 'Frank Tyus,' and up at the top it says 'Johnny.'"
> And they basically indicated, well, initially that was the name he had used in dealing with the CI on one or more occasions. They thought his name was Frank. But when they realized, no, there is no Frank Tyus, or if there is, this is not the -- Frank Tyus is not the guy who's living with Kanga Buford. The guy who's living with Kanga Buford is the guy that they eyeballed as having arrested a few days earlier, driving her car, when they went into the Surreywood Apartments and arrested him.
> So they said, "We know this is the guy. The CI may have been confused on the name. And a lot of times," they said -- which makes sense -- "a lot of times most of your drug dealers don't give you an ID when they sell you drugs."
>
> . . . .
>
> I think that would be a smart thing to do if you're selling drugs, whether -- most of the buys that are made that come to court, they would never have sold to this person if they thought or suspected he was an ID [sic]. A lot of times it's street names.
> The CI thought his name was Frank, and they looked into it, and no -- and corrected it to say no, it's Johnny Tyus. And how do they know it's Johnny Tyus? Well, they followed this car and the passenger to Kanga Buford's house or to the Surreywood Apartments.
>
> [POST-CONVICTION COUNSEL]: Did it at least seem to you that identity should be part of your trial strategy?
>
> [TRIAL COUNSEL]: If there were indeed anybody named Frank Tyus, that would be a possibility, except for the fact that we could -- Kanga Buford -- well, except for the fact that the two officers identified him. It wouldn't matter if they called him Geronimo. "I thought his name was Geronimo." That would be fine.
> Except, I said, "These people are going to get up and face-to-face identify you, especially Kanga Buford, who will say, 'Yeah, I've known him for two-and-a-half years. We live together. That's definitely who was in my car.'"

Just because the CI has the wrong name or called him Geronimo would make no impact, I felt, on a jury, once she testified. He was sure she would not testify against him.

. . . .

Apparently there is someone named Frank Tyus, but he was in jail. And that may be what, in fact, led them to realize the CI is wrong; his name is not Frank. There's a Frank Tyus, but he's in jail over in Brownsville.

. . . .

[THE STATE]: Did [the petitioner] ever really offer you any suggestions as to a defense, other than they apparently changed the name in this narrative from Frank to Johnny?

[TRIAL COUNSEL]: I think that sort of sums up what Mr. Tyus' thought was, that since this report had something whited out, we must be able to prove it was a conspiracy.
And I said, "No, there is not really. There is some inaccuracy, and maybe they were wrong and they're going to clear that up. But there's no conspiracy out there to manufacture some evidence just to put you away. Why would they do that?"

[THE STATE]: Did [the petitioner] ever indicate to you that there was any other person that lived with Kanga Buford or would drive around with Kanga Buford, that may have looked like him, that could have been confused with [the petitioner]?

[TRIAL COUNSEL]: No.

[THE STATE]: Did he ever indicate that there was anybody else that lived or stayed with Kanga Buford?

[TRIAL COUNSEL]: No.

[THE STATE]: Did he ever give you any alibi witness that would say he was not in Tipton County on April 4th or for any other reason it was impossible for him to have done this?

[TRIAL COUNSEL]: No.

In its order denying the petition, the post-conviction court summarized the identification evidence at trial which implicated the petitioner as the person who sold cocaine to the confidential informant:

> [The confidential informant] testified that he knew the [petitioner] personally, knows what type of car he drove and where he lived. [The confidential informant] testified about buying 6 or 7 rocks of cocaine from the [petitioner]. This event was monitored by law enforcement and was recorded.
> A tape of the transaction was recorded and that tape was played to the jury.
> [Narcotics Investigator] Mike Rose testified that he wired [the confidential informant] with a recording device, after searching him, and gave him $120 to attempt to buy illegal drugs with. He followed [the confidential informant] in a different vehicle. He confirmed the tag number of the vehicle in which the [petitioner] sat as a passenger when he sold the drugs. The tag number was the car of Canga Buford, the girlfriend of the [petitioner]. He overheard the drug transaction by the monitoring device. It was about 6 p.m. and still daylight.
> . . . .
> Canga Buford testified that she has a child by the [petitioner]. She knew the [petitioner] had 3 pagers. She identified that [petitioner] as being with her.

The post-conviction court explained why the petitioner's identification claim was without merit:

> [Trial counsel] testified that the report had the name Frank Tyus because that was a name that [the petitioner] had used with the undercover agent on occasions. The name may have been changed when they followed the car and passenger to Canga Buford's house and recognized [the petitioner]. Ms. Buford identified the petitioner at trial.
>
> . . . .
>
> There was no showing that the wrong person was convicted, even though one document had the name Frank on it. [Trial counsel] determined that there was a Frank Tyus, who was in jail at the time and could not have been the person. The undercover agent knew the [petitioner] as Frank. His name was corrected to the proper name.

The record fully supports the findings and conclusions of the post-conviction court. At trial, the confidential informant identified the petitioner as the person from whom he purchased cocaine and identified the voice on the audiotape of the transaction, which was played for the jury, as the petitioner's voice. Investigator Rose testified that when he was monitoring the transaction, he "actually saw [the petitioner] and the black female pull up" in her vehicle. Buford testified that the petitioner lived with her at the time of the drug transaction and they had a child together. The record

also reflects that trial counsel did question Investigator Rose about the incorrect name, "Frank," on one of the investigative documents:

> Q. Now who is Frank Tyus?
>
> A. That was the name that we were given at first. He did not give his name as . . . Johnny.
>
> Q. Well, it wasn't on the tape but I would say this person or the name Frank Tyus was something that when you say was given to us, that's what [the confidential informant] told you the man's name was; is that correct?
>
> A. That's correct.
>
> Q. And he also told you that Canga Buford was the black female?
>
> A. No.
>
> Q. Okay. But that's who he described as being at that point in time who he believed the passenger to be and Mr. Frank Tyus?
>
> A. Correct.

We conclude that the record on appeal fully supports the post-conviction court's determination that the petitioner failed to show that trial counsel was ineffective or that he was prejudiced by the alleged ineffectiveness of trial counsel.

## CONCLUSION

Following our review, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE
